CITY OF MEDFORD vs. FELLSMERE REALTY CO., INC.
& another.

Middlesex.   December 6, 1962. — February 13, 1963.

Present: WILKINS, C.J., WHITTEMORE, CUTTER, KIRK, & SPIEGEL, JJ.

*Subdivision Control. Bond,* Subdivision control bond. *Surety. Practice, Civil,* Auditor: exhibits.

Exhibits intended to be included in the report of an auditor should be filed with the clerk of court. [478]

A municipal planning board has no authority under G. L. c. 41, §§ 81A-81GG, to obligate the municipality to construct sewer and water mains in a subdivision approved by the board. [481]

A statement in a regulation of the planning board of a city, that "Sanitary sewer and water lines and their appurtenances necessary to serve the subdivisions will be installed by the city," recited the understanding of the board and a subdivider of what the city would do and made the installation of the lines by it a condition of the obligation of the subdivider, secured by a surety bond given by him to the city, to construct a way within his subdivision, notwithstanding that in his application to the board for approval of the subdivision plan he had certified, as required by the board, that "arrangements . . . [had] been made with the appropriate . . . city departments concerned for supplying . . . water and sanitary sewerage" to the lots in the subdivision. [478–479, 481]

Where installation by a city of water and sewer mains in a subdivision was a condition of the obligation of the subdivider, secured by a surety bond given by him to the city, to construct a way in the subdivision after approval of the subdivision plan by the planning board, failure of the city to install the mains prejudiced the subdivider and the surety and precluded recovery by the city against the surety in an action on the bond based on failure of the subdivider fully to perform the construction of the way. [482]

CONTRACT. Writ in the Superior Court dated October 14, 1958.

The action was heard by *Paquet,* J., on an auditor's report.

*Mark E. Gallagher, Jr.,* City Solicitor, for the plaintiff.

*Samuel H. Cohen (Vincent Galvin* with him) for the defendant New Amsterdam Casualty Company.

WHITTEMORE, J.   The city of Medford brought this action on a bond given by Fellsmere Realty Co., Inc. (Fellsmere), as principal, and New Amsterdam Casualty Company (New Amsterdam), as surety, conditioned in substance on Fellsmere's complying with the requirements of the planning board of the city imposed in connection with its approval of Fellsmere's plan of a subdivision of land, including an extension of Maurice Street, under the subdivision control law.   (G. L. c. 41, §§ 81K–81GG, inserted by St. 1953, c. 674, § 7.)

After an auditor's report (facts final) a judge in the Superior Court ordered judgment for New Amsterdam, and for the city against Fellsmere for the damages found by the auditor, with interest ($6,725.60).   These are the city's exceptions to the denial of its motion for judgment against New Amsterdam and to the order for judgment for New Amsterdam.

The bill of exceptions purports to incorporate seven exhibits and to provide that they "may be used at the . . . argument or . . . on briefs."   Certain of these exhibits are so mentioned in the auditor's report as to be incorporated therein by reference.   Good practice, however, calls for the filing with the clerk, as an express part of the report, any exhibits intended to be included therein.

Fellsmere's application for approval of its subdivision plan was a part of a form which included the "revised subdivision regulations" of the planning board under authority of G. L. c. 41, "Sections 81–K to 81–U . . . inserted by . . . [St. 1947, c. 340]."   The reference is to the subdivision control law prior to the 1953 amendment.   The application recites that it is made "subject to all the rules and regulations of the . . . board," and that the "applicant hereby certifies that arrangements have been made with the appropriate private utility companies and city departments concerned for supplying to every lot in the subdivision electricity, (gas), telephone service, water and sanitary sewerage; and, further, that the applicant agrees to bear any charges that may be made by the appropriate private utility

companies and city departments concerned for providing these services. It is understood, however, that ordinary installation charges on the private property of every lot shall be borne by the developer of the lot.''

Regulation J provides: ''Installation of Certain Public Utilities Required — The subdivider shall, at his own expense, install the necessary pipes and appurtenances to take care of the surface and subsurface water of the roadways and adjoining land. The size and quality of the pipes, manholes, catch basins, as well as their number, location and depth shall be as specified by the city engineer. Sanitary sewer and water lines and their appurtenances necessary to serve the subdivisions will be installed by the city, subject to the usual frontage assessments (in the case of sanitary sewer lines), house connection charges (in the cases of both water and sanitary sewer lines), and water charges.''

The condition of the bond is that Fellsmere ''shall in all things stand to and abide by, and well and truly keep and perform, in the time and manner specified, the covenants, conditions and agreements in the application and agreement signed by the planning board January 25, 1956, being the written requirements specifying the work to be done by . . . [Fellsmere] under which approval of a certain subdivision known as Maurice Street Extension has been granted.''

The bond is attached to a document signed by the planning board under date of January 25, 1956, and by Fellsmere, entitled ''Requirements of Planning Board on Pet. #183 . . . For the Laying out of Maurice St. . . . as shown on two plans accompanying the petition (hereinafter described).'' It recites a vote that the board would approve the petition upon receipt of a bond, ''approval to be based upon the satisfactory completion of the physical work hereinafter described.'' Included in the description of the work is the requirement all ''utilities, including connections to the street line, shall be installed before the gravel course is placed.''

The auditor found, inter alia, as follows: In April, 1956, when the street had been brought to rough grade Fellsmere

called the Commissioner of Public Works and inquired when the city would start "installing sewer and water"; thereafter, the city "temporized and delayed, and shunted Fellsmere's representative from one city department or official to another"; "[a]fter more than a month, and many repetitions of . . . [the request for installation] the planning board said it had referred the matter to the sewer and water board, which had complete authority; that, therefore, the matter was out of its hands, and directed Fellsmere to take the matter up with . . . [that] board"; on June 25, 1956, Fellsmere's representative went to a meeting of the water and sewer commission, commonly called the "water board," in an effort to persuade it "to comply with the city's obligation (exhibit 1, p. 10, par. J) to supply water and sewer facilities"; the "commission did nothing except to 'lay on the table' the Fellsmere application . . ."; thereupon Fellsmere appealed to the mayor and the mayor called a conference in his office on July 2, 1956, attended by the mayor, the city manager, the director of public works, the city engineer, one or more members of the water board, and Fellsmere's representative; as a consequence the water board on July 16 voted to order the required work; the board told Fellsmere that it had neither manpower nor equipment to excavate the trench and the city would reimburse Fellsmere for doing it; there had been no appropriation for the work; the trench cost Fellsmere $14,623; at a meeting of Fellsmere, the water board's manager, the city manager, and the city engineer, it was pointed out that, had the city done the work, Fellsmere's incidental costs would have been $6,515.16, and that a fair reimbursement to Fellsmere would be $7,500 and this sum Fellsmere agreed to take and "representatives of the city agreed the . . . city would pay"; the city paid nothing and Fellsmere quit, leaving many things undone, the fair cost of which was $5,600.

The auditor concluded that regulation J applied with equal force to the city and Fellsmere and, in substance, that the failure of the city to install water and sewer facilities was a breach of an obligation imposed on the city by regu-

lation J which entitled Fellsmere to abandon the contract unless Fellsmere had waived its rights. "If the agreement between [the] city and Fellsmere for the latter's installation of the sewer and water lines . . . amounted to a modification of the contract . . . I leave it to the court to rule whether . . . [it] would discharge the bonding company. . . . So far as . . . [it] is matter of fact . . . I find . . . a modification."

The order for judgment for New Amsterdam cannot be sustained on the precise ground indicated in the auditor's report.

The planning board had no authority to impose upon the city an obligation to construct the sewer and water mains. G. L. c. 41, §§ 81A–81GG. The statement in regulation J of what the city would do, therefore, could not reasonably be understood as an undertaking for the city by the planning board.

This statement stands, however, as a recital of the understanding of both the planning board and the principal on the bond of what another department would do to make it possible for the principal to do the bonded work. We think it was a condition of the bonded obligation to construct the way that the city through its appropriate department install the sewer and water mains. The requirement that Fellsmere certify "that arrangements have been made with . . . city departments concerned for supplying to every lot in the subdivision . . . water and sanitary sewerage" does not destroy the force of the condition in regulation J. The certificate was assurance to the planning board and through it to the city as obligee on the bond that Fellsmere had done all that was called for by the requirements of the rules and practices of the department concerned to be done by it to cause water and sewerage to be supplied from the mains to the houses and that the department had indicated that it would act accordingly. But the planning board's insistence that it have this assurance, as a condition of the approval of the subdivision plan, does not show that it was not fundamental to Fellsmere's obligation to construct the way that the city construct the water and sewer mains.

We turn to the effect of the suggestion in the facts that Fellsmere's certificate was not true. There is no express finding to this effect. It is necessarily inferable, however, either that the necessary arrangements had been made and the water board had defaulted, or that the certificate was not true. A memorandum of the July 2, 1956, conference in the mayor's office was exhibit 13 before the auditor and is referred to by him. The facts recited in exhibit 13 would warrant the conclusion that Fellsmere had made seasonable application to the water board for the required work but that the board had refused to do anything until after planning board approval; also that Fellsmere had reapplied immediately after planning board approval but that, up to July 2, the water board had made no commitment, and indeed that it had no policy to construct mains for developers and was seeking a ruling that it need not do so. The auditor made no findings as to these possible facts. If we were to assume that the facts had been found as above stated, it would not follow that the failure of the city to construct the mains had thereby been overcome. If the city through the water board had had the policy of constructing mains, it is probable that having had seasonable application from Fellsmere the water board would have done the necessary work. The expensive delay did not result from the failure of Fellsmere to complete the arrangements; it resulted from the failure of the water board to do what the parties to the bond expected it to do. The prejudice to the principal and the surety is plain.

*Exceptions overruled.*